# In the United States Court of Federal Claims

No. 09-864 C

(E-Filed:  February 26, 2010, Under Seal)
(Refiled:  March 2, 2010)[1]

| | |
|---|---|
| MISSION CRITICAL SOLUTIONS, | ) |
| | ) |
| Plaintiff, | ) Bid Protest; Statutory |
| | ) Interpretation; Small Business |
| v. | ) Administration; Priority of |
| | ) Historically Underutilized |
| THE UNITED STATES, | ) Business Zone Program over 8(a) |
| | ) Business Development Program |
| Defendant. | ) |
| | ) |

John R. Tolle, McLean, VA, for plaintiff.  Bryan R. King, McLean, VA, of counsel.

Steven M. Mager, Washington, DC, with whom were Tony West, Assistant Attorney
General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director,
Commercial Litigation Branch, Civil Division, United States Department of Justice,
Washington, DC, for defendant.

OPINION

HEWITT, Chief Judge

      Before the court are Plaintiff Mission Critical Solutions' Motion for Judgment on
the Administrative Record and Memorandum in Support of Mission Critical Solutions'
Motion for Judgment on the Administrative Record (plaintiff's Motion or Pl.'s Mot.),
Defendant's Response and Cross-Motion for Judgment Upon the Administrative Record

---

[1] This Opinion was filed under seal on February 26, 2010.  The court requested that if
either party believed that the February 26, 2010 Opinion contained protected material that should
be redacted before publication, that party shall, by motion filed on or before March 1, 2010,
request that such protected material be redacted.  The court has received no motions from either
party requesting that the February 26, 2010 Opinion be redacted.  The court therefore publishes
the February 26, 2010 Opinion in its entirety.

(defendant's Response or Def.'s Resp.), Plaintiff's Reply to Defendant's Cross-Motion for Judgment on the Administrative Record (Pl.'s Reply), and Defendant's Reply to Plaintiff's Response to Cross-Motion for Judgment Upon the Administrative Record (Def.'s Reply).   This case presents what is primarily a legal, rather than a factual, question:   whether statutory language provides for the prioritization of the Historically Underutilized Business Zone (HUBZone) Program over the 8(a) Business Development Program (and over the Service-Disabled Veteran-Owned (SDVO) Business Concern Program, although not at issue in this case)[2] or provides for parity between the programs. Factual background from the Administrative Record (AR) and the parties' filings is provided as context for the legal dispute in this case.   For the following reasons, the court SUSTAINS the protest.

I.      Background

        A.      Facts and Circumstances Surrounding the Award at Issue[3]

        Plaintiff Mission Critical Solutions (MCS), an entity which is both an 8(a) program participant and a qualified Historically Underutilized Business Zone (HUBZone) small business, is the incumbent contractor providing Information Technology (IT) support services for the Office of the Judge Advocate General, United States Department

---

        [2] The Service-Disabled Veteran-Owned (SDVO) Business Concern Program is not at issue in the procurement addressed in this case, but the court's analysis of the priority of the Historically Underutilized Business Zone (HUBZone) statute necessarily requires that the SDVO program be treated in a manner parallel to the 8(a) program.   Compare 15 U.S.C. § 657f(b) (2006) ("In accordance with this section, a contracting officer may award contracts on the basis of competition restricted to small business concerns owned and controlled by service-disabled veterans . . . ." (emphasis added)) with 15 U.S.C. § 657a(b)(2)(B) (2006) ("[A] contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns . . . ." (emphasis added)).   The Government Accountability Office (GAO) reached a similar conclusion.   See Int'l Program Group, Inc., Comp. Gen. B-400278, B-400308, 2008 CPD ¶ 172, 2008 WL 4351134, at *4 (Sept. 19, 2008) (concluding that the discretionary language of the SDVO set-aside program, which uses the term "may," does not supersede the mandatory nature of the HUBZone set-aside program, which uses the term "shall").

        [3] The facts are taken from plaintiff's Complaint (Compl.), Plaintiff Mission Critical Solutions' Motion for Judgment on the Administrative Record (plaintiff's Motion or Pl.'s Mot.), Defendant's Response and Cross-Motion for Judgment Upon the Administrative Record (defendant's Response or Def.'s Resp.), and the Administrative Record (AR), and unless otherwise characterized, do not appear to be in dispute.

of the Army (Army)--the requirement at issue in this case.  Pl.'s Mot. 1, 2; AR 83.  Prior to January 2008, a large business, IBM, had provided the IT support services.  AR 83.  In December 2007 the Army requested an acceptance letter from the Small Business Administration (SBA) approving the nomination of MCS as the service provider.  AR 85.  The Army had determined that the requirement for IT support services was appropriate for set-aside under the SBA's 8(a) program and, with the SBA's concurrence, intended to issue a sole-source contract to MCS.  AR 85-86.  The SBA accepted the requirement into the 8(a) program and authorized the Army to negotiate directly with MCS.  AR 87.  The Army awarded the one-year contract, Contract No. W91WAW-08-C-0035, for just under $3.5 million to MCS on January 31, 2008.  Compl. ¶ 8; AR 83.

The Army decided that the follow-on contract for the IT support services would include a base year and two option years, increasing the anticipated value of the contract to approximately $10.5 million.  See AR 10, 83.  Because the contract value was in excess of the $3.5 million ceiling for sole-source awards provided in Federal Acquisition Regulation (FAR) § 19.805-1(a)(2), the Army determined that the contract could no longer be awarded to MCS, the incumbent 8(a) program contractor, on a sole-source basis.  AR 83.  FAR § 19.805-1 states:

> (a) Except ["[w]here an acquisition exceeds the competitive threshold" and "(1) [t]here is not a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market price; or (2) SBA accepts the requirement on behalf of a concern owned by an Indian tribe or an Alaska Native Corporation"], an acquisition offered to the SBA under the 8(a) Program shall be awarded on the basis of competition limited to eligible 8(a) firms if—
> (1) There is a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers and that award can be made at a fair market price; and
> (2) The anticipated total value of the contract, including options, will exceed $5.5 million for acquisitions assigned manufacturing North American Industry Classification System (NAICS) codes and $3.5 million for all other acquisitions.

48 C.F.R. § 19.805-1 (2009).  On December 17, 2008, the Army requested that the SBA issue an acceptance letter approving the nomination of Copper River Information Technology, LLC (Copper River), an Alaska Native Corporation, as the IT support services provider.  AR 136-37.  The Army had determined that the requirement was appropriate for set-aside under the SBA's 8(a) program and, with the SBA's concurrence, intended to issue a sole-source contract to Copper River.  Id.  The SBA accepted the requirement on behalf of Copper River on December 23, 2008, AR 139, and the Army

3

awarded the sole-source contract to Copper River on January 13, 2009, AR 141, 210.

MCS filed a protest with the Government Accountability Office (GAO) on January 28, 2009. AR 1-3. MCS argued that the Army should not have awarded the contract to Copper River on a sole-source basis, thereby depriving MCS of an opportunity to compete for the contract. Id. As both an 8(a) program participant and a qualified HUBZone small business, MCS argued that the Army should have competed the requirement among HUBZone small businesses under the HUBZone statute. AR 1-3, 26-28. At GAO's request, the SBA responded to the issue raised in the protest. AR 209. The Army filed two motions to dismiss the protest, both of which GAO denied. See AR 4, 35, 51, 69. GAO sustained MCS's protest on May 4, 2009, AR 252-59, and denied the SBA's request for reconsideration on July 6, 2009, AR 304-11.

On July 10, 2009, the Office of Management and Budget issued a memorandum directing executive branch agencies to disregard GAO's rulings in Mission Critical Solutions, Comp. Gen. B-401057, 2009 CPD ¶ 93, 2009 WL 1231855 (May 4, 2009), and International Program Group, Inc., Comp. Gen. B-400278, B-400308, 2008 CPD ¶ 172, 2008 WL 4351134 (Sept. 19, 2008), pending legal review by the executive branch. AR 312-13. On August 21, 2009, the Office of Legal Counsel of the United States Department of Justice (OLC) issued a memorandum opinion (OLC Opinion) addressing the issues raised in the MCS protest. AR 314-27. The OLC Opinion disagreed with GAO's analysis, concluded that the SBA's interpretation is a permissible construction of the relevant statutes, and stated that the OLC Opinion is--and GAO's decisions are not--binding on the executive branch. AR 315, 327. On September 28, 2009, the Army informed GAO that, as a result of the OLC Opinion, the SBA had decided not to release the IT support services requirement from the 8(a) program[4] and the Army would not be

---

[4] The Army argues that because the SBA has not released the contract from the 8(a) program and because Mission Critical Solutions (MCS) sought an injunction against the Army only, and not the SBA, the Army is prevented from competing the contract to HUBZone businesses and is left with no viable vehicle for the required information technology (IT) support services. Def.'s Resp. 35-36. Under Small Business Administration (SBA) regulations, the agency cannot set aside a contract to a HUBZone business concern if the contract is then within the 8(a) program. See 13 C.F.R. § 126.605 (2009) ("A contracting activity may not make a requirement available for a HUBZone contract if . . . [a]n 8(a) participant currently is performing the requirement through the 8(a) [business development (BD)] program or SBA has accepted the requirement for award through the 8(a)BD program, unless SBA has consented to release the requirement from the 8(a)BD program."). A contracting officer may request that the SBA release the requirement from the 8(a) program so that it may be awarded as a HUBZone contract. Id. § 126.606. The regulations provide, however, that the "SBA will grant its consent only where neither the incumbent nor any other 8(a) participant can perform the requirement." Id. The

implementing GAO's recommendations.  AR 349-50.

On October 9, 2009, MCS requested a recommendation from GAO that the Army pay MCS the costs of pursuing its protest before GAO.  AR 328-29.  The Army notified GAO that it did not intend to reimburse MCS for its costs because it believed the OLC Opinion prevented it from doing so.  AR 330-32.  On November 19, 2009, GAO dismissed MCS's request as "academic" in light of the Army's statement.  AR 353.  MCS filed a second protest of the same contract award on November 25, 2009, AR 354-59, which the GAO also dismissed as "academic" on December 7, 2009, AR 412-13.

MCS filed its notice of intent to protest in this court on December 11, 2009, and filed its Complaint on December 15, 2009.  Along with its Complaint, MCS filed a Motion for Preliminary Injunction, Docket Number (Dkt. No.) 2, and Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Preliminary Injunction, Dkt. No. 3.  Further to a conference call with the parties held on December 16, 2009,[5] the court denied plaintiff's Motion for Preliminary Injunction based on the parties' proposed briefing schedule and the understanding that the Army planned to stay any action on the awarded contract until March 4, 2010.  Def.'s Resp. 12.  MCS is currently providing the IT support services at issue under a bridge contract awarded on December 7, 2009 that can be extended through March 4, 2010.  See AR 372-411; Def.'s Resp. 12.

B.    Statutes at Issue

1.    8(a) Program:  15 U.S.C. § 637(a)

SBA's 8(a) program was established through an amendment to the Small Business Act on October 24, 1978, Pub. L. No. 95-507, § 202, 92 Stat. 1757, 1761 (codified as

---

Army is not able to award the contract to a HUBZone business on a sole-source basis because the value of the contract exceeds the $3 million cap imposed by statute.  Def.'s Resp. 36 (citing 15 U.S.C. § 657a(b)(2)(A)(ii)(II)).  At oral argument, the parties agreed that whatever relief may be granted by the court in this case would be effective against the United States government as the defendant and not only the United States Army.  Oral Argument of February 12, 2010, Argument of Mr. Steven Mager at 2:37:40-2:38:35.  (The oral argument held on February 12, 2010 was recorded by the court's Electronic Digital Recording system (EDR).  The times noted refer to the EDR record of the oral argument.)

[5] The court included counsel representing Copper River Information Technology, LLC (Copper River), the proposed awardee, as a participant in the court's December 16, 2009 conference call.  However, Copper River did not choose thereafter to participate in the litigation as defendant-intervenor or otherwise.

amended at 15 U.S.C. § 637).  Its stated purposes include "promot[ing] the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals" and "clarify[ing] and expand[ing] the program for the procurement by the United States of articles, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals."  15 U.S.C. § 631(f)(2) (2006).[6]  The statute defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."  Id. § 637(a)(5).  "Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities . . . ."  Id. § 637(a)(6)(A).  According to the statute, "[t]he [g]overnment-wide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year."  Id. § 644(g)(1).

The 8(a) statute provides:

It shall be the duty of the [Small Business] Administration and it is hereby empowered, whenever it determines such action is necessary or appropriate—

(A) to enter into contracts with the United States Government and any department, agency, or officer thereof having procurement powers . . . .  In any case in which the Administration certifies to any officer of the Government having procurement powers that the Administration is competent and responsible to perform any specific Government procurement contract to be let by any such officer, such officer shall be authorized in his discretion to let such procurement contract to the Administration upon such terms and conditions as may be agreed upon between the Administration and the procurement officer. . . . ;
(B) to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns . . . . ;
(C) to make an award to a small business concern owned and controlled by socially and economically disadvantaged individuals . . . .

Id. § 637(a)(1)(A)-(C).  The statute then provides that "[a] contract opportunity offered

---

[6] All citations to the United States Code in this Opinion are to the 2006 code edition.

for award pursuant to this subsection shall be awarded on the basis of competition restricted to eligible [p]rogram [p]articipants" if certain criteria are met.  Id. § 637(a)(1)(D).

      2.      HUBZone Statute:  15 U.S.C. § 657a

The HUBZone program was established by the Small Business Reauthorization Act of 1997, Pub. L. No. 105-135, § 602(b)(1)(B), 111 Stat. 2592, 2627 (codified as amended at 15 U.S.C. § 657a).  The term "HUBZone" or "historically underutilized business zone" means "any area located within [one] or more--(A) qualified census tracts; (B) qualified nonmetropolitan counties; (C) lands within the external boundaries of an Indian reservation; (D) redesignated areas; or (E) base closure areas."  15 U.S.C. § 632(p)(1).  The program provides federal contracting assistance to qualified small business concerns operating in HUBZones through contracts awarded on a sole-source basis, contracts awarded on the basis of competition restricted to qualified HUBZone small business concerns, and a ten-percent bid adjustment for contracts awarded through full and open competition.  See id. § 657a(a)-(b).  The statute provides that a "Government[-]wide goal for participation by qualified HUBZone small business concerns shall be established at . . . not less than 3 percent of the total value of all prime contract awards for fiscal year 2003 and each fiscal year thereafter."  Id. § 644(g)(1).

The HUBZone statute establishes the HUBZone program within the SBA:  "There is established within the [Small Business] Administration a program to be carried out by the Administrator to provide for Federal contracting assistance to qualified HUBZone small business concerns in accordance with this section."  Id. § 657a(a).  The statute provides that "[n]otwithstanding any other provision of law," id. § 657a(b)(2), "a contracting officer may award sole source contracts under this section to any qualified HUBZone small business concern" if certain criteria are met, id. § 657a(b)(2)(A).  The statute also provides that "[n]otwithstanding any other provision of law," id. § 657a(b)(2), "a contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns" if certain criteria are met, id. § 657a(b)(2)(B).  Finally, the statute provides that "[n]otwithstanding any other provision of law," id. § 657a(b)(2), "the Administrator [of the SBA] may notify the contracting officer of the intent to appeal the contracting officer's decision, and . . . may file a written request for reconsideration of the contracting officer's decision with the Secretary of the department or agency head" should the contracting officer decide "not to award a contract opportunity under this section to a qualified HUBZone small business concern," id. § 657a(b)(2)(C).

II.      Bid Protest Jurisdiction

A.      Jurisdiction

Section 1491(b)(1) of title 28 of the United States Code provides the United States Court of Federal Claims (Court of Federal Claims) with jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," regardless of "whether suit is instituted before or after the contract is awarded."  28 U.S.C. § 1491(b)(1) (2006).  The court reviews a bid protest action under the standards set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4); NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  The APA provides that an agency's decision is to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004); Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001).

To come within the § 1491(b)(1) bid protest jurisdiction of the Court of Federal Claims, the plaintiff is required to establish that it "(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest."  Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006)).  To prove a direct economic interest as a putative prospective bidder, the plaintiff must establish that it had a "substantial chance" of being awarded the contract.  Id.  "[A] bid protester must have a substantial chance of receiving an award in order to have an economic interest in it and therefore standing to file a bid protest."  Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1379 (Fed. Cir. 2009) (citing Info. Tech. & Applications Corp. v. United States (Info. Tech.), 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("In order to establish standing, [the protester] must show that it is an actual or prospective bidder . . . whose direct economic interest would be affected by the award of the contract or by failure to award the contract . . . .").

The parties in this case have not raised the issue of standing, but the court is satisfied that plaintiff has standing to bring this bid protest.  See Weeks Marine, Inc., 575 F.3d at 1359 (citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) ("[I]f the record discloses that the lower court was without jurisdiction [the appellate] court will notice the defect, although the parties make no contention concerning it.")).  MCS was not an "actual bidder" because it did not have the opportunity to bid.  The Army issued a sole-source award based on an interpretation of the law that prevented MCS from competing for the contract.  MCS has established that it was the incumbent contractor providing the IT support services at issue and that it would have competed for the award had the contract been competed under the HUBZone statute.  Compl. ¶¶ 5, 33-

34.  As an 8(a) program participant, a qualified HUBZone small business, and the incumbent contractor, MCS has established that it had a "substantial chance" of receiving the award but for the alleged error in the procurement process.  Compl. ¶¶ 15, 33-34.  If plaintiff's bid protest is sustained because the procurement was not in accordance with law, the government would be obligated to compete the contract under the HUBZone statute, and plaintiff could compete for the contract.  Under these circumstances, plaintiff has a "substantial chance" of receiving the award, an economic interest, and standing to challenge the award.  See Impresa, 238 F.3d at 1334 (citing Alfa Laval Separation, Inc. v. United States (Alfa Laval), 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  In other words, MCS has "a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations."  See Weeks Marine, Inc., 575 F.3d at 1362.

B.      Motion for Judgment Upon the Administrative Record

Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment upon the administrative record.  See RCFC 52.1.  A motion for judgment upon the administrative record is distinguishable from a motion for summary judgment.  Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005); see Rules Committee Notes to RCFC 52.1 ("Summary judgment standards are not pertinent to judicial review upon an administrative record.").  The standards and criteria governing the court's review of agency decisions in response to a motion for judgment on the administrative record under RCFC 52.1 vary depending upon the specific law to be applied in the particular case.  See Rules Committee Notes to RCFC 52.1.

When challenging a procurement on the ground of a statutory or regulatory violation, the protester "'must show a clear and prejudicial violation of applicable statutes or regulations.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting Impresa, 238 F.3d at 1333).  If an agency's decision is found to have been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" pursuant to 5 U.S.C. § 706(2)(A), a protestor must also show that the error was significantly prejudicial.  Alfa Laval, 175 F.3d at 1367 ("To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process." (citations omitted)).  "'To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.'"  Id. (quoting Data General Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).  Instead, a protester "must show that there was a 'substantial chance' it would have received the contract award but for the errors."  Bannum, 404 F.3d at 1353 (citing Info. Tech., 316 F.3d at 1319); see also Alfa Laval, 175 F.3d at 1367.

III.    Discussion:  Statutory Interpretation

A.     Introduction

The parties and the court are in accord that this case turns on questions of statutory interpretation, in particular whether statutory language provides for the prioritization of the HUBZone program over the 8(a) program or provides for parity between the programs.  This statutory interpretation requires an examination of the language of the Small Business Act, in particular the HUBZone and 8(a) statutes.

A court must first consider "whether Congress has directly spoken to the precise question at issue."  Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc. (Chevron), 467 U.S. 837, 842 (1984).  In ascertaining whether "Congress had an intention on the precise question at issue," the court should "employ[] traditional tools of statutory construction."  See id. at 843 n.9.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842-43.  However, "if the statute is silent or ambiguous with respect to the specific issue," the court considers whether the agency's interpretation is based on a permissible construction of the statute.  See id. at 843.

Accordingly, the statutory text provides the starting point for the court's analysis.  Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003) (citing Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)).  "[I]n interpreting a statute a court should always turn first to one, cardinal canon [of construction] before all others. . . . [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  Conn. Nat'l Bank, 503 U.S. at 253-54.  "[T]he meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms."  Caminetti v. United States, 242 U.S. 470, 485 (1917).  "What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will.  Therefore, the courts are bound to give effect to the expressed intent of the legislature.  The courts must be guided by what the legislature said in the statute in question, not by what the courts may think the legislature said."  2A Norman J. Singer & J.D. Shambie Singer, Statutes & Statutory Construction § 46:3, at 165-69 (7th ed. 2007).

B.     Interpretation of Relevant Provisions of the Small Business Act

1.     The Purpose of the Small Business Act

Because the Small Business Act contains the statutory provisions establishing the HUBZone and 8(a) programs, the court examines the statements of purpose provided by the Small Business Act.  Congress set out the policy and goals behind the Small Business Act in 15 U.S.C. § 637(d)(1) and 15 U.S.C. § 644(g).  In § 637(d)(1), Congress lists the

10

several types of small business concerns to which the Small Business Act is intended to afford "opportunity."

> It is the policy of the United States that small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women, shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency . . . .

15 U.S.C. § 637(d)(1) (emphasis added).  In § 644(g), Congress set out government-wide participation goals for small business concerns generally and for certain small business concerns in procurement contracts:

> The Government-wide goal for participation by small business concerns shall be established at not less than 23 percent of the total value of all prime contract awards for each fiscal year. . . . The Government[-]wide goal for participation by qualified HUBZone small business concerns shall be established at . . . not less than 3 percent of the total value of all prime contract awards for fiscal year 2003 and each fiscal year thereafter.  The Government-wide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.

Id.§ 644(g)(1) (emphasis added).  Plaintiff and defendant agree that Congress did not prioritize one small business program over another under either § 637(d)(1) or § 644(g). See Def.'s Resp. 16-17; Pl.'s Reply 8.  The parties differ, however, in their views of what the agreed lack of prioritization in these two sections indicates.  See Def.'s Resp. 16-17; Pl.'s Reply 8.  Defendant argues that because § 644(g) "demonstrates that Congress intended that the goals of both programs were to be pursued concurrently" and § 637(d)(1) "treats the programs as co-equal," the SBA's regulations providing for parity between the HUBZone and 8(a) programs are permissible.  Def.'s Resp. 16-17.  Plaintiff argues that the Department of Justice "erroneously interprets the fact that Congress chose to not distinguish between the different small business procurement programs [in § 637(d)(1) and § 644(g)] as evidence of intent that each program be treated equally, even though Congress never stated that each program would be treated equally."  Pl.'s Mot. 12-13; see Pl.'s Reply 8.  Plaintiff asserts that "if Congress did not intend to differentiate between the different small business procurement programs, it would have ensured each

11

program contained identical, or at least similar, statutory language implementing the terms of each program . . . ."  Pl.'s Mot. 13; Pl.'s Reply 8.  The court agrees that Congress's statements of policy and goals do not appear to distinguish between the programs or prioritize one over the other.

The court now turns to the statutory language implementing the HUBZone and 8(a) programs to determine whether the implementing provisions indicate the prioritization of the HUBZone program over the 8(a) program.

2.       Implementing Provisions Prioritizing the HUBZone Program over the 8(a) Program

a.       "Notwithstanding any other provision of law"

The HUBZone statute provides:

Notwithstanding any other provision of law—

. . . .

(B) a contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns if the contracting officer has a reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers and that the award can be made at a fair market price . . . .[7]

15 U.S.C. § 657a(b)(2) (emphasis added).  Plaintiff argues that the meaning of the phrase "notwithstanding any other provision of law" is plain on its face and "shows that [the statute] was clearly written to supersede other small business contracting rules."  Pl.'s Mot. 9; Pl.'s Reply 7.  Defendant, apparently conceding that the plain meaning of the phrase supports plaintiff's interpretation, argues that the phrase "notwithstanding any other provision of law" is not always to be construed literally, Def.'s Resp. 23 (citing Or. Natural Res. Council v. Thomas, 92 F.3d 792, 796-97 (9th Cir. 1996) and In re Glacier Bay, 944 F.2d 577, 582 (9th Cir. 1991)), especially "where such language narrows an important provision of the same statute," id. (citing Ministry of Def. & Support for the

---

[7] "The provisions providing for competition among qualified HUBZone small business concerns where the contracting officer has a reasonable expectations that not less than two qualified HUBZone small business concerns will submit offers and that the award can be made at a fair market price is often referred to as the 'rule of two.'"  Def.'s Resp. 5.

Armed Forces of the Islamic Republic of Iran v. Elahi (Elahi), 129 S. Ct. 1732, 1744 (2009)).  Defendant argues that the SBA has reasonably interpreted the phrase to refer to provisions outside of the Small Business Act, for example, the otherwise applicable requirement that government contracts are awarded on the basis of "full and open competition."  Id. (referring to 41 U.S.C. § 253a(a)(1)(A)).  According to defendant's argument and the SBA's interpretation, "notwithstanding any other provision of law" does not refer to provisions found within the Small Business Act, such as those included in the statutory section implementing the 8(a) program.  See id.

The cases that defendant cites in support of the proposition that the phrase "notwithstanding any other provision of law" is not always to be construed literally are distinguishable from this case.[8]  In all three cases, other language in the same statute indicated that Congress intended to exclude only certain laws or rights from the application of the phrase "notwithstanding any other provision of law."

Oregon Natural Resources Council v. Thomas involved a challenge by environmental groups to sales by the United States Forest Service of timber located on lands subject to President Clinton's Northwest Forest Plan, commonly referred to as "Option 9."[9]  92 F.3d 792, 794 (9th Cir. 1996).  The United States Court of Appeals for the Ninth Circuit (Ninth Circuit) examined the language of the FY 1995 Emergency Supplemental Appropriations for Disaster Relief and Rescissions Act (Rescissions Act), designed "to provide harvestable timber to the people who live and work in the region of [O]ption 9," to determine on what basis a challenge to Option 9 timber sales could be brought.  Id. at 795-97 (quoting S. Rep. No. 17, 104th Cong., 1st Sess. 122 (1995)).

---

[8] The two opinions defendant cites from the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) are not binding on this court but may be persuasive authority.  The United States Court of Appeals for the Federal Circuit (Federal Circuit) has affirmed a plain meaning interpretation of the phrase "notwithstanding any other provision of law."  See Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1346 (Fed. Cir. 2004) ("The introductory phrase '[n]otwithstanding any other provision of law' connotes a legislative intent to displace any other provision of law that is contrary" to the terms of the law introduced by the phrase.).

[9] The Ninth Circuit uses the term "Option 9" to refer to "the Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl adopted in the Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl (April 13, 1994)."  Or. Natural Res. Council v. Thomas, 92 F.3d 792, 794 n.3 (9th Cir. 1996).

In <u>Oregon Natural Resources Council</u>, the Ninth Circuit was presented with a statute that contained, in one subsection, the phrase "notwithstanding any other law" and that, in another subsection, clearly excluded the application of a certain class of laws--all federal environmental and natural resource laws--to timber sales while still providing for judicial review of agency decisions not in accordance with applicable law.  See id.  In interpreting the statutory provisions at issue, the Ninth Circuit examined the language of other sections of the Rescissions Act for evidence of Congress's intent.  See id. at 797.  The Ninth Circuit noted that it was "[m]indful . . . of the common-sense principle of statutory construction that sections of a statute generally should be read to give effect, if possible, to every clause."  Id. (quoting <u>Heckler v. Chaney</u>, 470 U.S. 821, 829 (1985)).

The Ninth Circuit examined three provisions of the Rescissions Act related to Option 9 timber sales.  See id. at 795-96.  Section 2001(d) provided that "'[n]otwithstanding any other law . . . the Secretary concerned shall expeditiously prepare, offer, and award timber sale contracts' on Option 9 land."  Id. at 795 (quoting Rescissions Act § 2001(d)).  Section  2001(i) of the Rescissions Act specifically stated that "[t]he documents and procedures" relating to the timber sales "shall be deemed to satisfy the requirements of . . . [t]he National Forest Management Act . . .[and] [a]ll other applicable Federal environmental and natural resource laws."  Id. (quoting Rescissions Act § 2001(i)).  Section 2001(f)(1) provided that "'a timber sale . . . under subsection (d) . . . shall be subject to judicial review.'"  Id. at 796 (quoting Rescissions Act § 2001(f)(1)).  The Ninth Circuit concluded that the language of § 2001(i) ("shall be deemed to satisfy the requirements of . . . [t]he National Forest Management Act . . .[and] [a]ll other applicable Federal environmental and natural resource laws") did not foreclose challenges based on other laws, including "federal contracting laws" and "other non-environmental laws."  Id. at 795-96.  The Ninth Circuit therefore determined that "subsection 2001(d)'s direction to expedite the preparation, offer and award of Option 9 sales '[n]otwithstanding any other law' is best interpreted as requiring the disregard only of environmental laws, not all laws otherwise applicable to Option 9 sales."  Id. at 796.  To conclude otherwise would have rendered the provision for judicial review of Option 9 sales found in section 2001(f)(1) superfluous.  Cf. id. at 797 (concluding that "'notwithstanding any other law' . . . directs the disregard only of the federal environmental and natural resource laws" and that "[s]ubsection 2001(f)(1)'s provision for judicial review of Option 9 sales is therefore not superfluous").

The Ninth Circuit found further support for its Option 9 conclusion in its interpretation of Rescissions Act provisions regarding salvage timber sales.  Id. ("[O]ther subsections of the Rescissions Act suggest Congress did not intend the phrase 'notwithstanding any other law' to require the agency to disregard all otherwise applicable laws.").  Subsection 2001(b)(1) of the Rescissions Act provided that certain activities related to contracts for salvage timber sales "shall be performed . . .

14

notwithstanding any other provision of law." Id. Subsection 2001(f)(4) of the
Rescissions Act set out the standard of review for legal challenges to salvage timber sales
by granting the courts review authority to determine whether the agency's decision was
"arbitrary and capricious or otherwise not in accordance with applicable law (other than
those laws specified in subsection (i) [i.e., all federal environmental and natural resource
laws])." Id. The Ninth Circuit considered the possibility of giving a broader
interpretation to the phrase "notwithstanding any other provision of law" found in
subsection 2001(b) and concluded that if the phrase were "given the broadest possible
interpretation, subsection 2001(f)(4)'s allowance for legal challenges to salvage timber
sales based on non-environmental laws would be nugatory." Id. Instead, the court
"harmonized" the two subsections by interpreting the phrase "notwithstanding any other
provision of law" as "super[s]eding only the federal environmental and natural resource
laws." Id.

In Oregon Natural Resources Council, the Ninth Circuit was presented with a
statute that clearly excluded the application of a certain class of laws--all federal
environmental and natural resource laws--to timber sales while still providing for judicial
review of agency decisions "not in accordance with applicable law." See id. at 795, 797.
The Ninth Circuit examined the language of other sections of the same act for evidence of
Congress's intent and construed the sections of the statute so as to give effect to every
clause. Id. at 797. Further, the Ninth Circuit relied on its own prior precedent, which
had determined that "the phrase in one statute, 'notwithstanding the provisions of any
other law,' was not dispositive of whether other statutes applied, because a different
section of the first statute arguably made the other statutes applicable." Id. at 796 (citing
In re Glacier Bay, 944 F.2d 577, 582 (9th Cir. 1991)) ("Following Glacier Bay, . . . we
decline to adopt the broadest possible interpretation of 'notwithstanding any other
provision of law' . . . .").

Here, the court examines the language of other sections of the Small Business Act
for evidence of Congress's intent and finds no language that suggests that Congress
meant to exclude other unenumerated provisions of the Small Business Act from the
application of the phrase "notwithstanding any other provision of law." There is,
however, a provision in the HUBZone statute that lists, by name or section number,
particular statutes that have priority over the HUBZone program and are presumably
excluded from application of the phrase "notwithstanding any other provision of law."
See 15 U.S.C. § 657a(b)(4). This provision is entitled "Relationship to other contracting
preferences" and states: "A procurement may not be made from a source on the basis of a
preference provided in paragraph (2) [sole-source and restricted competition awards] or
(3) [ten-percent bid adjustment in full and open competition awards], if the procurement
would otherwise be made from a different source under section 4124 [prison-made
products] or 4125 [prison camp services] of Title 18 or the Javits-Wagner-O'Day Act (41

U.S.C. 46 et seq.) [products and services purchased from nonprofit agencies for the blind and severely handicapped]." Id. § 657a(b)(4).  Defendant argues that this provision indicates that Congress expressly stated when it was prioritizing a particular non-competitive provision or program under the Small Business Act.  Def.'s Resp. 22. Defendant argues:  "[A]lthough this provision clearly establishes the priority of these other contracting preferences, the HUBZone statute does not expressly provide that the HUBZone program be given priority over SBA's other contract assistance programs. Accordingly, Congress did not clearly intend for the HUBZone program to have such priority."  Id.  The "omission" defendant argues as evidence of lack of clear intent also supports a contrary position, however.  Congress could have expressly stated that the phrase "notwithstanding any other provision of law" refers to provisions outside of the Small Business Act, or that other sections of the Small Business Act are excluded from application of the phrase, if that is, as defendant argues, see Def.'s Resp. 23, 30-31, what Congress intended.  What section 657a(b)(4) makes very clear is that, if Congress wished to establish the relationship of the HUBZone program to another contracting preference program, it knew how to do so.

There is no language within the HUBZone statute, or elsewhere in the Small Business Act, that creates a special category of laws that are not applicable to agency actions taken under the statute.  Cf. Or. Natural Res. Council, 92 F.3d at 795-96 (concluding that statutory language foreclosed challenges to agency actions on the basis of "[a]ll other applicable [f]ederal environmental and natural resource laws").  Similarly, no provision of the HUBZone statute refers to other "applicable law" as distinct from a category of laws that are not applicable.  Cf. id. at 797 (determining that statutory language provided for judicial review when an agency's decision was "arbitrary and capricious or otherwise not in accordance with applicable law (other than those laws specified in subsection (i) [i.e., all federal environmental and natural resource laws])" (quoting Rescissions Act § 2001(f)(4))).  In other words, no other statutory language within the Small Business Act compels the conclusion that Congress intended the phrase "notwithstanding any other provision of law" to have a more limited meaning than its plain language indicates.

In re Glacier Bay, 944 F.2d 577, 582 (9th Cir. 1991), on which the Oregon Natural Resources Council court and defendant rely, is similarly distinguishable from the present case.[10]  The issue before the Ninth Circuit in that case was whether the Trans-Alaska

---

[10] Another court has also concluded, in the repeal by implication context, that Oregon Natural Resources Council and In re Glacier Bay, among others involving the phrase "notwithstanding any other provision of law," were "inapposite because the ['notwithstanding'] language was found in the same enactment as the non-repealed statute or was incorporated by reference, the language purported to preempt state law, or would render other language within the

Pipeline Authorization Act (TAPAA), 43 U.S.C. §§ 1651-1655, implicitly repealed the Limitation of Vessel Owner's Liability Act (Limitation Act), 46 U.S.C.App. §§ 181-189. In re Glacier Bay, 944 F.2d at 578-79.  Although TAPAA's introductory paragraph provided that "'notwithstanding the provisions of any other law,' the owner of a vessel carrying trans-Alaska oil and the [Trans-Alaska Pipeline] Fund 'shall be strictly liable without regard to fault in accordance with the provisions of this subsection,'" the court did not "find the ['notwithstanding'] phrase dispositive in this case." Id. at 582.  Other sections within TAPAA itself referred to "other applicable" state or federal laws, and the Ninth Circuit noted that the Limitation Act could be one of the applicable laws. Id.  As the court observed, "whether or not the Limitation Act is one of the 'other applicable' laws is the important question in this appeal." Id.  The court concluded that "the 'notwithstanding' phrase by itself sheds no light on whether the Limitation Act is one of these 'other applicable' laws." Id.  The Ninth Circuit held that the comprehensive nature of TAPAA demonstrated that TAPAA "was designed to supersede any conflicting law" and "implicitly repealed the Limitation Act with regard to the transportation of trans-Alaska oil." Id. at 583.  The Glacier Bay decision is distinguishable from this case because the Ninth Circuit was examining two separate acts to determine whether one had implicitly repealed the other. See id. at 579.  Here, the court is examining two sections within the Small Business Act.  Neither party in this case has argued that these two sections are in irreconcilable conflict with one another such that one has been implicitly repealed.  Nor does the HUBZone statute reference "other applicable" state or federal laws.

Elahi can also be distinguished from the present case.  In Elahi, the Supreme Court examined a private citizen's ability to attach a "blocked asset" of the Iranian

---

same statute 'nugatory.'" Bald Eagle Ridge Prot. Ass'n v. Mallory, 119 F. Supp. 2d 473, 483-84 (M.D. Pa. 2000), aff'd, 275 F.3d 33 (3d Cir. 2001) (unpublished table decision) (citing, with explanatory parentheticals: "[Nw. Forest Res. Council v. Pilchuck Audubon Soc'y, 97 F.3d 1161, 1167 (9th Cir. 1996)] (earlier statutes not repealed when incorporated by reference); Oregon Natural Resources Council v. Thomas, 92 F.3d 792, 797 (9th Cir. 1996) (provision giving courts jurisdiction to enjoin actions not in accordance with applicable law would be nugatory if no other laws applicable); E.P. Paup Co. v. Director, 999 F.2d 1341, 1348-1349 (9th Cir. 1993) (state law not preempted by 'notwithstanding' language, especially in light of legislative history expressing a contrary intent); Golden Nugget, Inc. v. American Stock Exchange, Inc., 828 F.2d 586, 588-589 (9th Cir. 1987) (per curiam; state law not preempted when evidence showed Congress'[s] intent was to allow SEC regulation of specific field and to overrule prior court decision). Cf. In re Glacier Bay, 944 F.2d 577, 582-583 (9th Cir. 1991) ('notwithstanding' language not necessarily preemptive because same act referred to other provisions of law, but finding repeal by implication because overall scheme in conflict with earlier laws)." [sic passim]).

17

government[11] in order to satisfy a judgment the citizen had obtained against the Iranian government for its role in the death of his brother. 129 S. Ct. at 1735. The private citizen, Elahi, had accepted $2.3 million from the United States government under the Victims of Trafficking and Violence Protection Act of 2000 (VPA) as partial compensation for his judgment against Iran. Id. at 1735, 1741. The VPA was amended by the Terrorism Risk Insurance Act of 2002 (TRIA), which added three provisions relevant to the Court's analysis. See id. at 1735, 1744. One provision requires those who receive compensation to relinquish "all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal, [or] that is the subject of awards rendered by such tribunal" (the relinquishment provision). Id. at 1741 (emphasis omitted) (quoting VPA § 2002(a)(2)(D), as amended by TRIA § 201(c)). The "blocked asset" sought by Elahi was at issue in claims against the United States before an international tribunal. Id. at 1735; supra note 11. A second provision states: "'[n]otwithstanding any other provision of law' the 'blocked assets' of a state 'shall be subject to . . . attachment in aid of execution' of a terrorism-related judgment." Elahi, 129 S. Ct. at 1744 (quoting TRIA § 201(a)). A third provision states: "'[N]othing in this subsection [which contains the relinquishment provision] shall bar . . . enforcement of any' terrorism-related 'judgment . . . against assets otherwise available under this section or under any other provision of law.'" Id. (emphasis omitted) (quoting VPA § 2002(d)(4), as added by TRIA § 201(c)(4)).

The Supreme Court determined that Elahi had waived his right to attach the blocked asset by accepting partial compensation from the United States government and thereby relinquishing "'all rights' to attach property 'at issue' in an international tribunal." Id. at 1744-45. The Court noted that "several courts of appeals have apparently assumed[] [that] the relinquishment of 'all rights' includes the right given by TRIA § 201(a) to attach blocked assets." Id. at 1744 (citing a decision from each of the Fourth, Seventh and Second Circuit Courts of Appeals). The Supreme Court stated that "the relinquishment provision . . . was added to the VPA by the very same statute, the

[11] President Carter, by executive order, had "blocked all property and interest in property of the Government of Iran . . . subject to the jurisdiction of the United States" after the Iranian Revolution broke out and militants in Iran seized American hostages. Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi (Elahi), 129 S. Ct. 1732, 1735-36 (2009) (quoting Exec. Order No. 12170, 3 C.F.R. § 457 (1979 Comp.). The United States and Iran settled the crisis, in part with the Algiers Accords, which established the Iran-U.S. Claims Tribunal, an international arbitration tribunal, to resolve remaining disputes over contracts, agreements, and other claims. Id. at 1736. As discussed below in the text, the Supreme Court determined that, regardless of whether the "Cubic Judgment" Elahi sought to attach was a "blocked asset," Elahi could not attach the judgment because it was "at issue" in a claim against the United States before the Iran-U.S. Claims Tribunal. Id. at 1735.

18

TRIA, that permitted the attachment of blocked assets, and which contains the
'notwithstanding' clause upon which Elahi relies." Id.  From this, the Court concluded
that "Congress could not have intended the words to which Elahi refers [the
'notwithstanding' phrase] to narrow so dramatically an important provision [the
relinquishment provision] that it inserted in the same statute." Id.  In response to Elahi's
argument that the legislative history supported a reading of the statute that allows for
attachment of blocked assets "notwithstanding" the relinquishment provision, the Court
pointed out that "the [legislative] history suggests that Congress placed the
'notwithstanding' clause in § 201(a) for totally different reasons, namely to eliminate the
effect of any Presidential waiver . . . ." Id.

        The Supreme Court's opinion in Elahi therefore addressed two provisions of the
same statute--regarding the right to attachment and the relinquishment of "all rights"--that
were seemingly in conflict with another.  See id.  Elahi had argued that the purpose of the
statute was "to enable victims of terrorism to collect on judgments they have won against
terrorist parties" and that such a victim should therefore be able to attach a blocked asset
"notwithstanding" the relinquishment provision.  Id. at 1743.  The majority, however,
believed "Congress had a more complicated set of purposes in  mind"--a set of purposes
that included compensating victims such as Elahi but that also "protect[ed] property that
the United States might use to satisfy its potential liability to Iran." Id.  The majority
therefore read the relinquishment provision as an "important provision" that should not be
"narrow[ed] so dramatically" by the provision giving victims the right to attach blocked
assets.[12]  Id. at 1744.  The fundamental question in the case was whether the right to

_____

        [12] The three-justice dissent argued that the majority misread the relinquishment provision
and "surmise[d] that Congress also had a 'more complicated' purpose" in order "[t]o contravene
the statute's clear design." See Elahi, 129 S. Ct. at 1748 (Kennedy, J., dissenting).  The dissent
stated that the text of the Victims of Trafficking and Violence Protection Act of 2000 (VPA) and
the Terrorism Risk Insurance Act of 2002 (TRIA) amendments showed that Congress's primary
purpose was "to enable the victims of terrorism to execute on the assets of a state found to have
sponsored or assisted in a terrorist act." Id. at 1747.  The effect of the "notwithstanding" phrase
in the first subsection of the TRIA would therefore be "to ensure that other laws do not bar
victims' efforts to enforce judgments against terrorist states." Id.  According to the dissent, the
"notwithstanding" provision, coupled with the provision entitled "Statutory Construction" and
reading "[n]othing in this subsection shall bar, or require delay in, enforcement of any judgment
to which this subsection applies under any procedure" demonstrated Congress's intent to broaden
rather than limit the rights of victims.  Id. (quoting VPA § 2002(d)(4), as added by TRIA §
201(c)(4)).  The dissent in Elahi therefore disagreed with the majority as to which of the two
seemingly conflicting provisions should prevail and appears to adopt a plain meaning
interpretation of the phrase "notwithstanding any other provision of law." Id. at 1747-48.

attach blocked assets was included among "all rights" that must be relinquished in exchange for government compensation. See id. at 1741. Read in that way, the question in Elahi regarding "all rights" was similar to the question in Oregon Natural Resources Council and Glacier Bay regarding "applicable law"--the question of what rights or laws are excluded from the application of the phrase "notwithstanding any other provision of law." In all three cases, the statutory language provided the answer, with other sections of the same statute providing indications of Congress's intent to exclude certain laws or rights from the application of the phrase "notwithstanding any other provision of law."

In this case, the Small Business Act does not contain two such conflicting provisions as were found within the TRIA in Elahi. The HUBZone statute makes no reference to other "applicable law," as did the statutes examined in Oregon Natural Resources Council and Glacier Bay. Congress did not explicitly provide for parity between the HUBZone and 8(a) programs. See supra Part III.B.1. Moreover, Congress gave the SBA and contracting officers discretion to decide to place contracts within the 8(a) program, see 15 U.S.C. § 637(a), while dictating to contracting officers that a contract opportunity shall be awarded under the HUBZone statute on the basis of competition when certain criteria are met, see id. § 657a(b)(2)(B). The two programs are not in conflict because contracts may, in the contracting officers' discretion, be placed within the 8(a) program whenever the HUBZone statutory criteria are not met. See id. § 637(a). The mandatory HUBZone statute has not preempted the 8(a) program, thereby rendering its statutory provisions meaningless. Nor does the HUBZone statute suggest that there is a category of laws that Congress intended to exclude from the application of the phrase "notwithstanding any other provision of law." In contradistinction, there is no other statutory language within the Small Business Act that compels the conclusion that Congress intended the phrase "notwithstanding any other provision of law" to have a more limited meaning than its plain language indicates.

The court is not persuaded by defendant's argument for its interpretation of the phrase "notwithstanding any other provision of law" and declines to interpret the statutory language to have a meaning more narrow than its plain language. "The courts must be guided by what the legislature said in the statute in question, not by what the courts may think the legislature said." 2A Singer, supra, § 46:3, at 165-69. As the Supreme Court has stated, the use of a "notwithstanding" phrase in a statute "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993) (citing Shomberg v. United States, 348 U.S. 540, 547-48 (1955)). The Supreme Court also noted that the Courts of Appeals generally have "interpreted similar 'notwithstanding' language . . . to supersede all other laws, stating that a clearer statement is difficult to imagine." Id. (quoting Liberty Mar. Corp. v. United States, 928 F.2d 413, 416 (D.C. Cir. 1991) (internal quotation marks and brackets omitted)).

20

"The introductory phrase '[n]otwithstanding any other provision of law' connotes a legislative intent to displace any other provision of law that is contrary" to the terms of the law introduced by the phrase.  See Shoshone Indian Tribe of Wind River Reservation v. United States (Shoshone), 364 F.3d 1339, 1346 (Fed. Cir. 2004) (holding that Congress intended, under the Department of the Interior and Related Agencies Appropriations Act, Public Law No. 108-7, that the statute of limitations contained in 28 U.S.C. § 2501 not begin to run on an Indian tribe's claims until the claimant has been provided with an accounting).  "Any other provision of law" therefore encompasses provisions found within the Small Business Act, including the provisions implementing the 8(a) program. The operative language of the statute combines the phrases "[n]otwithstanding any other provision of law" and the directive that the "contract opportunity shall be awarded" on the basis of competition among qualified HUBZone small business concerns whenever the specified criteria, or "rule of two," see supra note 7, are met.  See Shoshone, 364 F.3d at 1346 (concluding that the operative language of the statute at issue was "the combination of the phrases '[n]otwithstanding any other provision of law' and the directive that the statute of limitations 'shall not commence to run' on any claim until an accounting is provided").  The combination of these two phrases supports the conclusion that the statutory language is mandatory and that the plain meaning of the HUBZone statute requires a contract opportunity to be competed among qualified HUBZone small business concerns whenever the specified criteria are met, notwithstanding other provisions of law--including those found within the Small Business Act itself.

      b.    "[S]hall be awarded"

According to the HUBZone statute, "a contract opportunity shall be awarded pursuant to [section 657a] on the basis of competition restricted to qualified HUBZone small business concerns" if the rule of two is met.  15 U.S.C. § 657a(b)(2)(B) (emphasis added).  Plaintiff argues that "this language is clear on its face that the 'shall' mandates a set-aside for HUBZone small business concerns when the conditions of the HUBZone statute are met."  Pl.'s Mot. 8.  In support of its argument, plaintiff refers to the similar interpretation reached by the GAO in Mission Critical Solutions, Comp. Gen. B-401057, 2009 CPD ¶ 93, 2009 WL 1231855 (May 4, 2009) and International Program Group, Inc., Comp. Gen. B-400278, B-400308, 2008 CPD ¶ 172, 2008 WL 4351134 (Sept. 19, 2008).  Pl.'s Mot. 3-5, 8-9.  Plaintiff also notes that the Ninth Circuit interpreted the HUBZone statutory language as mandatory, in contrast with the discretionary language of the 8(a) statute.  Pl.'s Mot. 13 (citing Contract Mgmt., Inc. v. Rumsfeld, 434 F.3d 1145, 1149 (9th Cir. 2006)).

Defendant argues that the single word "shall" in one portion of a section of the Small Business Act is not sufficient to establish legislative intent that a statutory provision be mandatory.  Def.'s Resp. 19.  Defendant cites a Federal Circuit decision

noting that "Congress's use of the two terms 'may' and 'shall' does not end the analysis." Id. (quoting Ky., Educ. Cabinet, Dep't for the Blind v. United States, 424 F.3d 1222, 1227 (Fed. Cir. 2005)). Defendant argues that the court may consider "indications of legislative intent to the contrary or [] obvious inferences from the structure and purpose of the statute.'" Id. (quoting United States v. Rodgers, 461 U.S. 677, 706 (1983)). Defendant further argues that, even if the use of the word "shall" does create a priority for HUBZone competition when the rule of two is met, that priority is over HUBZone sole-source awards rather than over 8(a) concerns, which are governed under a separate section of the Small Business Act. Id. According to defendant, the language of the HUBZone competition provision should be interpreted in relation to the sole-source provision that comes just before it in the HUBZone statute. Def.'s Resp. 19, 20. The HUBZone statute provides that "a contracting officer may award sole source contracts under this section to any qualified HUBZone small business concern" if certain criteria are met. 15 U.S.C. § 657a(b)(2)(A) (emphasis added). Defendant argues that "the structure of the HUBZone program section establishes that the 'shall' in the HUBZone restricted competition provisions of 15 U.S.C. § 657a(b)(2)(B) is intended to be contrasted with the 'may' in the HUBZone sole source provisions of 15 U.S.C. § 657a(b)(2)(A)[,] not the 8(a) provisions." Def.'s Resp. 20. Because the two parallel provisions are structurally tied and represent two methods of awarding a contract, "it therefore makes most sense to compare these two methods to each other" according to defendant. Id.

"The word 'shall' is ordinarily '[t]he language of command.' And when the same [r]ule uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense-the one act being permissive, the other mandatory." Anderson v. Yungkau, 329 U.S. 482, 485 (1947) (citations omitted). Although there may be certain circumstances under which the court must analyze further Congress's intent in using the words "shall" and "may," such an analysis is not warranted here. Indeed, the case cited by defendant for the proposition that the court's analysis should extend beyond Congress's choice of terms did not suggest that the legislative use of the word "shall" should be questioned but rather involved the discretionary nature of "may." See United States v. Rodgers, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion. This common-sense principle of statutory construction is by no means invariable, however, . . . and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute."). "'Shall' is considered presumptively mandatory[13] unless there is something in the context

---

[13] According to Black's Law Dictionary, "shall" means "[h]as a duty to; more broadly, is required to." Black's Law Dictionary 1407 (8th ed. 2004). The additional commentary states: "This is the mandatory sense that drafters typically intend and that courts typically uphold. . . .

or the character of the legislation which <u>requires</u> it to be looked at differently."  3 Singer, <u>supra</u>, §57:2, at 8-9 (emphasis added).

The court interprets the language of the HUBZone competition provision--"shall be awarded"--to be mandatory, such that a contract opportunity must be set aside for competition among qualified HUBZone small business concerns whenever the rule of two is met.  The court agrees that the "shall" of the competition provision contrasts with the "may" of the sole-source provision but does not conclude that the mandatory nature of the HUBZone competition provision is bounded by this relationship.  The court concludes that the HUBZone competition provision is properly interpreted as mandatory in relationship to both the sole-source provision and the 8(a) program provisions, and that this interpretation is further supported by the differences in the statutory language providing authority for contract decisionmaking and program administration.

c.      "[O]ffered for award pursuant to this section"

In contrast to the HUBZone statute, the 8(a) statute explicitly affords discretion both to the SBA and to agency contracting officers in deciding whether to place a contract opportunity in the 8(a) program.  As to the discretion of the SBA, the 8(a) statute provides:  "It shall be the duty of the Administration and it is hereby empowered, <u>whenever it determines such action is necessary or appropriate</u> . . . to enter into contracts with the United States Government and any department, agency, or officer thereof having procurement powers . . . ."  15 U.S.C. § 637(a)(1)(A) (emphasis added).  As to the discretion of agency contracting officers, the 8(a) statute provides that a contracting officer "shall be authorized <u>in his discretion</u> to let such procurement contract [as to which the SBA has certified it is "competent and responsible to perform"] to the Administration."  <u>Id.</u> (emphasis added).  The Small Business Administration is then empowered "to arrange for the performance of such procurement contracts by negotiating

---

Only [this sense] is acceptable under strict standards of drafting."  <u>Id.</u>  The preference for following the plain meaning interpretation of "shall" and other terms of relative degree of obligation has been further emphasized by Singer:

> Where the language of a statute is clear and unambiguous, courts may hold that the construction intended by the legislature is obvious from the language used.  The ordinary meaning of language should always be favored.  The form of the verb used in a statute, i.e., something 'may,' 'shall' or 'must' be done, is the single most important textual consideration determining whether a statute is mandatory or directory.

3 Norman J. Singer & J.D. Shambie Singer, <u>Statutes & Statutory Construction</u> § 57:3, at 16-18 (7th ed. 2007).

23

or otherwise letting subcontracts to socially and economically disadvantaged small business concerns . . . as may be necessary to enable the Administration to perform such contracts" and "to make an award to a small business concern owned and controlled by socially and economically disadvantaged individuals."  Id. § 637(a)(1)(B)-(C).

In terms similar to the competition provision of the HUBZone statute, the 8(a) statute uses the word "shall" in its competition provision.  The 8(a) statute provides:

> A contract opportunity offered for award pursuant to this subsection shall be awarded on the basis of competition restricted to eligible Program Participants if—
>
> (I) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and
>
> (II) the anticipated award price of the contract (including options) will exceed $5,000,000 in the case of a contract opportunity assigned a standard industrial classification code for manufacturing and $3,000,000 (including options) in the case of all other contract opportunities.

Id. § 637(a)(1)(D)(i).  The two differ, however, in identifying what shall be awarded.  The 8(a) statute specifies, "A contract opportunity offered for award pursuant to this subsection shall be awarded on the basis of competition . . . ," id. (emphasis added), while the HUBZone statute lacks the limiting words "offered for award pursuant to this subsection," see id. § 657a(b)(2)(B).  The HUBZone statute simply states:  "[A] contract opportunity shall be awarded pursuant to this section on the basis of competition . . . ."  Id. § 657a(b)(2)(B) (emphasis added).  By limiting "contract opportunity" by the words "offered for award pursuant to this subsection" in the 8(a) statute, Congress has inserted an opportunity for discretion by the contract decisionmaker.  The SBA may permissibly decide whether to place a contract opportunity in the 8(a) program and offer it for award according to the terms of the 8(a) statute.  See id. § 637(a)(1)(A), 637(a)(1)(D)(I).  Only after the SBA has made this decision, must such a contract opportunity be awarded on the basis of competition whenever the specified criteria are met.  See id. § 637(a)(1)(D)(i).

The HUBZone statute does not afford the SBA a similar opportunity for discretion. The statute entrusts the SBA Administrator with carrying out the program, but specifies that it is to be done in accordance with the HUBZone statute:  "There is established within the [Small Business] Administration a program to be carried out by the

Administrator to provide for Federal contracting assistance to qualified HUBZone small business concerns in accordance with this section." Id. § 657a(a).  In laying out the "[a]uthority of contracting officer[s]" to act on "[e]ligible contracts," the statute gives the contracting officer discretion in awarding sole-source contracts by providing that "a contracting officer <u>may</u> award sole source contracts under this section" if certain criteria are met.  Id. § 657a(b)(2)(A) (emphasis added).  There is no similar discretion in the competition provision.  Instead, the HUBZone statute provides that "<u>a contract opportunity shall be awarded pursuant to this section</u> on the basis of competition restricted to qualified HUBZone small business concerns if the contracting officer has a reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers and that the award can be made at a fair market price . . . ."  Id. § 657a(b)(2)(B) (emphasis added).

Defendant argues that, despite the differences in the statutory language, the competition provisions of the 8(a) and HUBZone statutes should be interpreted in the same manner.  Specifically, according to defendant, it makes no difference to the interpretation of the statute that the words "pursuant to this section" come after the words "shall be awarded" in the HUBZone statute while the words "pursuant to this subsection" come after the words "contract opportunity offered for award" in the 8(a) statute.  See Def.'s Resp. 19-20.  Defendant argues that the inclusion of the phrase "pursuant to this section" in the HUBZone statute indicates that the directive can effectively be read as if it stated that "contracts awarded 'pursuant to this section' are subject to the enumerated conditions."  Id.  Defendant further argues that a contrary interpretation would render the phrase "pursuant to this section" mere surplusage.  Def.'s Resp. 20 (citing Clark v. Arizona, 548 U.S. 735, 755 n.24 (2006)).  Plaintiff contends that defendant's interpretation leads to a "confusing and circular result."  Pl.'s Mot. 12.  According to plaintiff, if one reads "pursuant to this section" in the manner defendant suggests, "it is as if the HUBZone statute states if the requirements of the statute are met, then the contract award may be set aside for HUBZone small business concerns, in which case, the contracting officer must award to a HUBZone small business concern only if the requirements of the statute are met."  Id.  Plaintiff argues for the "simple[r] explanation" that the phrase "pursuant to this section" merely relates the competition provision to the section as a whole and refers to the additional terms of the HUBZone statute.  Id.

The court finds plaintiff's interpretation not only simpler and more straightforward but also more fully expressive of the intent of Congress.  The court interprets the phrase "pursuant to this section" as relating the competition provision to the HUBZone statute as a whole.  Under this plain language, plain grammar interpretation, the phrase does not become mere surplusage as defendant contends.  Defendant's interpretation would, in effect, change the wording of the HUBZone statute to resemble more closely the 8(a) statute.  As written, the HUBZone statute states that "a contract opportunity shall be

awarded pursuant to this section . . . ."  15 U.S.C. § 657a(b)(2)(B).[14]

The court has examined the language of the Small Business Act, in particular the HUBZone and 8(a) statutes, to determine whether the statutory language provides for the prioritization of the HUBZone program over the 8(a) program or provides for parity between the programs.  The court agrees with both parties in this case that Congress's statements of policy and goals do not appear to distinguish between the programs or prioritize one over the other.  However, the statutory language implementing the HUBZone and 8(a) programs indicate that the HUBZone program takes priority over the 8(a) program whenever the specified criteria found in 15 U.S.C. § 657a(b)(2)(B) are met.  The court has concluded that the phrase "[n]otwithstanding any other provision of law" encompasses provisions found within the Small Business Act, including the provisions implementing the 8(a) program.  The operative language of the HUBZone statute combines the phrases "[n]otwithstanding any other provision of law" and the directive that the "contract opportunity shall be awarded" on the basis of competition among qualified HUBZone small business concerns whenever the specified criteria are met.  The combination of these two phrases supports the conclusion that the statutory language is mandatory and that the plain meaning of the HUBZone statute requires a contract opportunity to be competed among qualified HUBZone small business concerns whenever the specified criteria are met, notwithstanding other provisions of law-- including those found within the Small Business Act itself.  The court has concluded that the HUBZone competition provision is properly interpreted as mandatory in relationship to both the sole-source provision and the 8(a) program provisions, and that this interpretation is further supported by the differences in the statutory language providing authority for contract decisionmaking and program administration.  Unlike the 8(a) statute and the sole-source provision of the HUBZone statute, the HUBZone competition provision does not afford the contracting officer discretion to decide whether or not to award a contract in accordance with its terms.  Instead, the HUBZone statute provides that "a contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns if the contracting officer has a reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers and that the award can be made at a fair market price . . . ."  15 U.S.C. § 657a(b)(2)(B) (emphasis added).

C.    Legislative History

---

[14] If Congress had desired to insert an opportunity for discretion by the contracting officer, it could certainly have done so by providing an alternate wording of the HUBZone competition provision, for example, "a contract opportunity offered for award pursuant to this section shall be awarded."

Plaintiff argues that the statutory language of the Small Business Act, and the HUBZone statute in particular, is clear and that therefore the court need not look to legislative history.  See Pl.'s Mot. 13-14; Pl.'s Reply 8-9.  Plaintiff acknowledges that the legislative branch is appropriately charged with determining the relative priority of the small business programs and may change the statutory language at any time.  Pl.'s Mot. 13-14; Pl.'s Reply 10.  Plaintiff argues that until such time as Congress acts, "the mandatory language contained in the HUBZone statute clearly trumps the discretionary language of the 8(a) and SDVO statutes."  Pl.'s Mot. 14; Pl.'s Reply 10.  Defendant argues that "the 'normal understanding of [a statute's] bare language is not conclusive,' and can be 'overcome by a persuasive showing from the purpose or history of the legislation.'"  Def.'s Resp. 24 (citing Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1083 (Fed. Cir. 2001) and Lutheran Mut. Life Ins. Co. v. United States (Lutheran Mutual), 602 F.2d 328, 331 (Ct. Cl. 1979)).[15]  Defendant argues that the purpose and legislative history of the Small Business Act indicate that "Congress did not intend for the HUBZone program to have priority over the 8(a) program."  Def.'s Resp. 24, 26.

The court agrees with plaintiff that an examination of legislative history is usually unnecessary where the statutory language is clear.  "Absent a clearly expressed legislative intention to the contrary, the statute's plain language must ordinarily be regarded as conclusive."  Wyeth v. Kappos, 591 F.3d 1364, 1369 (Fed. Cir. 2010) (internal quotation marks and brackets omitted) (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc. (GTE Sylvania), 447 U.S. 102, 108 (1980)).  "The language of the statute is the best indication of Congress's intent."  Shoshone, 364 F.3d at 1345 (citing GTE Sylvania, 447 U.S. at 118).  "[O]nly a 'most extraordinary showing of contrary intentions' by Congress

---

[15] The court has examined the cases that defendant cites for this boiler-plate proposition and has found that in none of those cases did the purpose or history of the legislation overcome the normal understanding of the statutory language.  See Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1083 (Fed. Cir. 2001) (holding that the statutory language controlled without "express statutory language from Congress or clear legislative history" to support a contrary reading); Lutheran Mut. Life Ins. Co. v. United States (Lutheran Mutual), 602 F.2d 328, 331 (Ct. Cl. 1979) (holding that the statute at issue was "complete and unambiguous" and that plaintiff "failed to show [through legislative history] that Congress meant what it did not say").  In addition, the cases cited for support by Lutheran Mutual, 602 F.2d at 331, likewise held that the plain statutory language was not challenged by the legislative history.  See Aparacor, Inc. v. United States, 571 F.2d 552, 554 (Ct. Cl. 1978) (holding that the "plain meaning" of the statute at issue was not "subverted by the legislative history"); Prairie Band of the Pottawatomie Tribe of Indians v. United States, 564 F.2d 38, 46 (Ct. Cl. 1977) (concluding that ambiguous legislative history was unpersuasive in overcoming the normal understanding of the statutory language).

justifies a departure from the plain language of a statute." Wyeth, 591 F.3d at 1371 (quoting Garcia v. United States, 469 U.S. 70, 75 (1984)).  The question is whether there is a "clearly expressed legislative intention" that modifies the plain meaning of the HUBZone statute.

Defendant argues that "[t]he plain meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.'"  Def.'s Resp. 24 (citing Watt v. Alaska, 451 U.S. 259, 266 (1981) and Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48 (1928)).[16]  Defendant asserts that the purpose of the Small Business Act, its legislative history, and congressional acquiescence all support the position that the SBA's regulations providing for parity between the HUBZone and 8(a) programs represent a reasonable interpretation of the Small Business Act.  See Def.'s Resp. 24-33.  The court does not find such evidence persuasive in

---

[16] The cases that defendant cites for this proposition are distinguishable from the present case.  Watt v. Alaska involved two conflicting statutes, "each of which by its literal terms applie[d] to the facts before [the Supreme Court]."  451 U.S. 259, 266 (1981).  The plain statutory language could not answer "which statute Congress intended to control."  Id.  In such a case, one would expect the interpreting court to look beyond the plain meaning of the conflicting statutes to determine Congress's intent.  Here, the court is not faced with two conflicting statutes.  See supra Part III.B.2.a.  In Boston Sand & Gravel Co., the Supreme Court examined whether the statutory language granting a court authority "to enter a judgment or decree for the amount of the legal damages sustained by reason of said collision [between vessels]" against the United States government included the authority to award interest on those damages.  Boston Sand & Gravel Co. v. United States (Boston Sand), 278 U.S. 41, 46-47 (1928).  The Court noted the general rule that the United States is not liable for interest and determined that Congress did not intend to allow interest as part of the damages under the statute.  Id. at 47.  In interpreting the statute, the Court acknowledged:  "If Congress has been accustomed to use a certain phrase with a more limited meaning than might be attributed to it by common practice it would be arbitrary to refuse to consider that fact when we come to interpret a statute."  Id. at 48.  The Court then concluded: "But as we have said the usage of Congress simply shows that it has spoken with careful precision, that its words mark the exact spot at which it stops, and that it distinguishes between the damages caused by the collision and the later loss caused by delay in paying for the first . . . ."  Id.  Absent express indication of contrary intent by Congress, the Supreme Court interpreted the statutory language in keeping with case law and other statutes limiting the availability of interest against the government.  See id. at 46-48.  In the present case, the statutory language is not susceptible of an interpretation contrary to an established principle recognized in case law or other statutes, such that the plain meaning interpretation of the words must be limited.  There is no suggestion in this case that "Congress has been accustomed to use a certain phrase with a more limited meaning," id. at 48, or that an interpretation of the HUBZone statutory language that departs from a plain language interpretation is necessary to prevent conflicts with other law.  As discussed in Part III.B.2.a, the HUBZone and 8(a) statutes are not in conflict.  The plain meaning interpretation of the mandatory HUBZone statutory language prevails.

overcoming the plain meaning of the statutory language in this case.

Defendant argues that the policy statement found in 15 U.S.C. § 637(d)(1) and the participation goals set out in 15 U.S.C. § 644(g) embody the purpose of the Small Business Act.  Def.'s Resp. 25-26.  Defendant does not point to extrinsic evidence of the statute's purpose.  See id.  The court has examined the statutory sections defendant cites and concluded that they do not appear to distinguish between the HUBZone and 8(a) programs or prioritize one over the other.  See supra Part III.B.1.  These "purpose" sections do not compel the conclusion that Congress intended for there to be parity between the two programs, nor do they preclude the language of the HUBZone statute from having mandatory effect.

Nor is the court persuaded to ignore the plain meaning of the statutory language by the legislative history that defendant cites.  The HUBZone statute was introduced as part of the Senate version of the Small Business Reauthorization Act.  Def.'s Resp. 26 (citing Small Business Reauthorization Act of 1997, S. 1139, 105th Cong., tit. vi (as reported by S. Comm. on Small Bus., Aug. 19, 1997, S. Rep. No. 105-62)).  Defendant notes that the original Senate version of the bill contained a "Parity Relationship" provision, which stated that the HUBZone provisions "shall not limit the discretion of a contracting officer to let any procurement contract to [SBA] under section 8(a)."  Id. (quoting 143 Cong. Rec. 18,118 (1997)).  Defendant also notes that after the House of Representatives removed the entire HUBZone program from the bill, the Senate reinstated the program-- but without the parity provision.  Id. at 27 (citing 143 Cong. Rec. 24,094-108).  "No explanation for the parity provision's omission was provided in the Senate record."  Id. (citing 143 Cong. Rec. 24,106).  Defendant then lists a number of comments by House members, expressing their concern "that the new HUBZone program not harm the existing 8(a) program."  Def.'s Resp. 28.

With no explanation from the Senate as to why the parity provision was omitted, the fact that it was omitted is inconclusive.  Individual Senators might have believed that the statutory language already provided for parity, as defendant suggests, and that the parity provision was redundant or even counterproductive, see Def.'s Resp. 27-28, or they might have decided that they did not intend for the programs to have parity.  The statements from House members are also unpersuasive in overcoming the plain language of the statute.  Because defendant's citations are limited solely to comments from the House of Representatives, it has at most offered evidence of the intent of the House, not of Congress.  See Lutheran Mutual, 602 F.2d at 331-32 ("Both of plaintiff's legal theories are based on legislative history which is limited solely to the Senate. While plaintiff speaks repeatedly of the intent of Congress, it has at most offered evidence of the intent of the Senate.").  It is not evident that the House members' generalized concern about the impact of the HUBZone program on the 8(a) program requires that the two programs

have parity.  Contracts may still be placed in the 8(a) program whenever the specified criteria in the HUBZone statute are not met.  As plaintiff notes, the 8(a) and HUBZone programs are not mutually exclusive--small business concerns that qualify under one of the other programs can also qualify under the  HUBZone program.[17]  Pl.'s Mot. 13.

Defendant also argues that "Congress has acquiesced to the SBA's parity regulations, and has affirmatively adopted the OLC legal opinion."  Def.'s Resp. 29.  Congress might well be aware of the SBA's regulations, but it is also aware of the statutory language it used in the Small Business Act and of the canons of construction used in interpreting statutes.[18]  See 2A Singer, supra, § 45:12, at 115-19 ("[L]egislative language will be interpreted on the assumption that the legislature was aware of existing statutes, of the rules of statutory construction, and of judicial decisions . . . ." (footnotes omitted)).  Faced with conflicting interpretations of the HUBZone statute from GAO and OLC, Congress could have taken action to amend the statute if its intent was not correctly expressed in the statute as written.  The fact that Congress chose not to does not demonstrate, as defendant proposes, Def.'s Resp. 32, that Congress intended a statutory interpretation other than the interpretation the statute's plain meaning provides.

---

[17] In fact, plaintiff MCS is both a HUBZone and an 8(a) program participant, Pl.'s Mot. 2, 13, as are at least twenty-two other eligible contractors listed in MCS's bid protest to GAO, see AR 2-3.

[18] Congress is also presumably aware that plain meaning interpretations regarding the mandatory nature of the HUBZone statutory language were also reached by the GAO in International Program Group, Inc., Comp. Gen. B-400278, B-400308, 2008 CPD ¶ 172, 2008 WL 4351134 (Sept. 19, 2008) and Mission Critical Solutions, Comp. Gen. B-401057, 2009 CPD ¶ 93, 2009 WL 1231855 (May 4, 2009), and by the Ninth Circuit in Contract Management, Inc. v. Rumsfeld, 434 F.3d 1145, 1149 (9th Cir. 2006)).  The Federal Circuit, in an unpublished opinion, cited to the Contract Management, Inc. opinion while examining an Air Force determination not to set aside a contract under the HUBZone program.  Blue Dot Energy Co. v. United States (Blue Dot), 179 Fed. App'x 40, 42, 46 (Fed. Cir. 2006).  In Blue Dot, the Air Force had instead issued a sole-source solicitation because it had determined that there was only one responsible source with a necessary state permit for solid waste disposal.  Id. at 42.  In describing the HUBZone program, the Federal Circuit stated:  "As required by the [HUBZone] program, 'a contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns if the contracting officer has a reasonable expectation that not less than 2 qualified HUBZone concerns will submit offers and that the award can be made at fair market price.'"  Id. (quoting 15 U.S.C. § 657a(B)).  The Federal Circuit also stated:  "Where the [agency] determines that two or more responsible qualified HUBZone concerns will submit offers, then the award is set-aside.  Where the [agency] determines, however, that fewer than two will submit offers, the [agency] is not required to set the award aside."  Id. at 46.

Defendant argues that "the congressional reaction to the GAO decision in <u>Mission Critical Solutions</u> confirms that Congress supports the SBA's current regulations and does not agree with the interpretation of the [Small Business] Act offered by MCS in this case." <u>Id.</u>  Defendant points to a conference report, in which the Senate receded, in support of its contention.  <u>Id.</u>; Def.'s Reply 11.  The report stated:

> The conferees note that the Department of Justice has concluded that no change to the Small Business Act is required to ensure that contracting officers of the Department of Defense and other federal agencies have the discretion whether or not to award contracts pursuant to the HUBZone program.  The conferees direct the Secretary of Defense to continue to administer the HUBZone program in a manner consistent with the Department of Justice opinion.

H.R. Rep. No. 111-288, at 789 (2009).  Congress's statements about the proper interpretation of a statute subsequent to the statute's passage are of little persuasive authority.  2B Singer, <u>supra</u>, § 49:6, at 112-16 ("Interpretations of legislation made by those lacking statutory authority to do so are given less weight than interpretations made by those who do have the requisite statutory authority.  This rule applies to informal interpretations by administrative authorities, arguments of counsel for an administrative agency, or the opinion of an Attorney General, and views expressed by members of subsequent legislatures concerning the meaning of acts passed by prior legislatures." (footnotes omitted)).  The statutory language remains the same, and the court is tasked with interpreting the law.  <u>Chevron</u>, 467 U.S. at 843 n.9 ("The judiciary is the final authority on issues of statutory construction . . . ."); 2A Singer, <u>supra</u>, § 45:3, at 22 ("Consistent with a system of separation of powers, it is said to be the function of the legislature to make the laws but for the courts to finally and authoritatively interpret what the law says.").  The court has examined closely the statutory language of the Small Business Act.  The court concludes that the language of HUBZone statute is unambiguous and mandatory and that the plain meaning of the HUBZone statute prevails.

      D.      Whether Deference by the Court to the SBA Interpretation of the Statute Is Proper

Defendant repeatedly contends that the SBA's interpretation of the statute is entitled to deference from the court.  <u>See</u> Def.'s Resp. 14, 18, 22, 34-35.  Defendant suggests that deference is particularly appropriate where the SBA has been granted the discretion to administer the statutory scheme.  Def.'s Resp. 14.  Defendant further argues that the SBA regulations "constitute a permissible interpretation of the statute at issue, and are consistent with the language, structure, purpose, and legislative history of the Small Business Act."  Def.'s Resp. 15.  Defendant emphasizes that the HUBZone statute provides:  "There is established within the Administration a [HUBZone] program <u>to be</u>

carried out by the Administrator . . . ."  See Def.'s Resp. 22-23 (quoting 15 U.S.C. § 657a(a) and adding emphasis).  Plaintiff does not dispute "the SBA's statutory authority to promulgate rules and regulations to enforce the Small Business Act" but argues that "this authority does not extend to the SBA the right to make rules and regulations that conflict with federal law."  Pl.'s Mot. 9; Pl.'s Reply 7.

Although it is true, as defendant contends, that the SBA Administrator is entrusted to carry out the HUBZone program, it is also true, as plaintiff points out, that Congress set out the statutory requirements of the program.  The full text of the statutory provision, on which the parties differ, reads:  "There is established within the Administration a program to be carried out by the Administrator to provide for Federal contracting assistance to qualified HUBZone small business concerns in accordance with this section."  15 U.S.C. § 657a(a) (emphasis added).  The court's role is to interpret the law.  Chevron, 467 U.S. at 843 n.9 ("The judiciary is the final authority on issues of statutory construction . . . ."); 2A Singer, supra, § 45:3, at 22 ("Consistent with a system of separation of powers, it is said to be the function of the legislature to make the laws but for the courts to finally and authoritatively interpret what the law says.").  Where a statute is clear and unambiguous, the court owes no deference to an agency's interpretation.  Chevron, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Only "if the statute is silent or ambiguous with respect to the specific issue" does the court consider whether the agency's interpretation is based on a permissible construction of the statute.  See id. at 843.  Because the language of the statute itself controls this case, this court finds no reason to afford special deference under Chevron to the SBA's interpretation.  See Wyeth, 591 F.3d at 1372; see also Pub. Employees Ret. Sys. of Ohio v. Betts, 492 U.S. 158, 171 (1989) ("[N]o deference is due to agency interpretations at odds with the plain language of the statute itself.").

IV.    Remedy

Section 1491(b)(2) of title 28 of the United States Code provides the court with discretion in awarding relief in a bid protest case:  "To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."  28 U.S.C. § 1491(b)(2) (emphasis added).  Section 1491(b)(3) further instructs:  "In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."  Id. § 1491(b)(3).  The APA provides that an agency's decision is to be set aside if it is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Before a court may grant a permanent injunction, a plaintiff seeking such relief must satisfy a four-factor test.  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  In deciding whether to award injunctive relief, a court considers:  "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief."  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).

Plaintiff seeks both declaratory and injunctive relief in this case.  In its Complaint, plaintiff requests that the court enter judgment in its favor and against defendant by "[d]eclar[ing] unlawful the sole source award to Copper River without [first] considering whether a set aside for HUBZone small business concerns was required"; by "[o]rder[ing] the Army to make a determination of whether there is a reasonable expectation that at least two qualified HUBZone small business concerns will submit offers, and the award can be made at a fair market price, prior to making any sole source award"; by "[a]ward[ing] MCS its costs and attorney's fees in this action as allowed by law"; and by "[g]rant[ing] such other and further relief as the [c]ourt deems just and equitable." Compl. 6-7.  Plaintiff asserts that as a result of the Army's action in awarding the contract to Copper River on a sole-source basis in violation of the HUBZone statute, "MCS was not allowed to compete on a procurement that it had a reasonable chance at award, and is thus an injured party."  Pl.'s Mot. 14.

Plaintiff has succeeded on the merits of this case.  The court has examined the statutory language of the Small Business Act and concluded that the mandatory language of the HUBZone statute requires that a contracting officer first determine whether the specified criteria are met before awarding a contract under another small business program or on a sole-source basis.  See supra Part III; 15 U.S.C. § 657a(b)(2)(B).  The HUBZone statute provides that "[n]otwithstanding any other provision of law . . . a contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns if the contracting officer has a reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers and that the award can be made at a fair market price . . . ."  15 U.S.C. § 657a(b)(2).  The Army's award of the contract to Copper River on a sole-source basis without first determining whether there was "a reasonable expectation that not less than [two] qualified HUBZone small business concerns will submit offers and that the award can be made at a fair market price" was not in accordance with law--in particular, the contract award did not comply with the plain meaning of the HUBZone statute.  See id.

33

§ 657a(b)(2)(B).

In the court's view, a balancing of the hardships to the respective parties weighs in favor of granting injunctive relief.  Plaintiff has asserted that, because the Army made the sole-source award as it did, MCS was not able to compete for the award of a procurement that it had a reasonable chance of being awarded and was thus injured.  Pl.'s Mot. 14.; Pl.'s Reply 10.  Defendant argues that an economic loss, such as an "unspecified, unproven loss of revenue," does not generally constitute irreparable harm.  Def.'s Reply 16-17.  However true it may be that there is no irreparable harm where the dispute involves, for example, an evaluation process for a particular award, here the harm is irreparable:  defendant's position is that plaintiff has no entitlement to be considered for award in any case analogous to this one.  By refusing to follow the HUBZone statute, defendant has created an irreparable harm.  Defendant asserts that the Army will be harmed if the court issues an injunction because of additional procurement costs and time spent.[19]  Def.'s Reply 17.  In the court's view, the additional time and procurement costs in this case do not constitute irreparable harm to the government, particularly where, as here, the initial procurement was not conducted in accordance with applicable law.  Defendant has not cast the alleged harm to the Army in terms of a threat to the national defense or national security.  See 28 U.S.C. § 1491(b)(3).  The court does not view the type of "hardship" to the Army addressed in defendant's affidavits[20] as a hardship appropriate for consideration in the context of a bid protest.

It is in the public interest to grant injunctive relief in this case.  The Army's award of the IT support services contract on a sole-source basis without first determining whether it should set aside the contract for restricted competition among qualified

---

[19] The affidavit attached to defendant's Reply estimates that "it will likely take between 120 - 180 days to make an award . . . based on [the Office of the Judge Advocate General Information Technology Division's] previous procurement experience."  Decl. of Lieutenant Colonel Charlotte R. Herring (Herring Decl.) ¶ 11 (attached to Def.'s Reply).

[20] Defendant alleges that the Army will be harmed by continued understaffing and delay in the release of important software applications under development if MCS remains in place as the IT support services provider during any reprocurement.  Def.'s Reply 17-18 (citing Herring Decl. ¶ 11).  Plaintiff disputes the allegations in defendant's affidavit, characterizing the statements as "inaccurate and misleading."  Decl. of Dave Dallman, Dkt. No. 25, ¶ 4.  Plaintiff's affidavit also tenders explanations of specific position vacancies and states that concerns regarding project delays have never been communicated to MCS.  Id. ¶¶ 5-9, 12.  Defendant's complaints regarding understaffing and project delays and plaintiff's responses to those complaints relate to contract performance.  Contract performance disputes are addressed under the provisions of the Contract Disputes Act and are not at issue here.  See 41 U.S.C. §§ 601-613 (2006).

34

HUBZone small business concerns was not in accordance with law.  See 15 U.S.C.
§ 657a(b)(2)(B).  There exists strong public interest in ensuring that government
procurement contracts are awarded in accordance with law.  The public interest factor, the
balancing of the hardships to the respective parties and plaintiff's success on the merits in
this case all weigh in favor of the granting of injunctive relief.  The court concludes that
plaintiff is entitled to both declaratory and injunctive relief in this case.

V.      Conclusion

        The court declares unlawful the Army's procurement actions in making the sole
source award to Copper River without first determining whether a set-aside for HUBZone
small business concerns was required under the HUBZone statute.  The court orders
defendant to determine whether the criteria of 15 U.S.C. § 657a(b)(2)(B) are met, such
that the contract opportunity at issue in this case must be awarded on the basis of
competition among qualified HUBZone small business concerns.  See 15 U.S.C.
§ 657a(b)(2)(B).  The court enjoins the United States from awarding the IT support
services contract at issue in a manner that is not in compliance with the Small Business
Act as the court here interprets it.

        The court therefore GRANTS Plaintiff's Motion for Judgment on the
Administrative Record and DENIES Defendant's Cross-Motion for Judgment Upon the
Administrative Record.[21]  The Clerk of Court is directed to ENTER JUDGMENT in favor
of plaintiff.


        IT IS SO ORDERED.

                                        s/ Emily C. Hewitt
                                        EMILY C. HEWITT
                                        Chief Judge

---

        [21] Plaintiff's Motion for Preliminary Injunction is DENIED AS MOOT and "Plaintiff
Mission Critical Solutions' Motion for Denial of Defendant's Supplementation of the
Administrative Record," more accurately characterized as a motion to strike the affidavit
attached to defendant's Reply, see Oral Argument of February 12, 2010, Argument of Mr. Steven
Mager at 2:59:28-3:01:54, is DENIED.